UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ROSEMARY MARTINEZ,

                Plaintiff,

       - against -

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
-----------------------------------------------------------X

<u>**MEMORANDUM AND ORDER**</u>

15-CV-3649 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Rosemary Martinez brings this action against defendant, the Acting

Commissioner of the Social Security Administration (the "Commissioner").  Martinez seeks

review of the determination of an administrative law judge ("ALJ") that she is not entitled to

Supplemental Security Income ("SSI") benefits, pursuant to 42 U.S.C. § 405(g).  (Compl. (Doc.

No. 1) at 2–3.)  Martinez requests that this Court remand the proceedings on the grounds of legal

error, failure to develop the record, and insubstantial evidence.  (Pl.'s Mem. Cross–Mot. (Doc.

No. 15) at 1.)  Martinez and the Commissioner have cross-moved for judgment on the pleadings

pursuant to Federal Rule of Civil Procedure 12(c).  (Pl.'s Cross-Mot. J. (Doc. No. 14); Def.'s

Mot. J. (Doc. No. 19).)  For the reasons set forth below, the Commissioner's motion is granted,

and Martinez's motion is denied.

## BACKGROUND

### I.      Procedural History

      On February 9, 2012, Martinez filed applications for both Social Security Disability

("SSD") and SSI benefits, alleging disability as of January 1, 2010, due to bipolar disorder,

depression, post-traumatic stress disorder ("PTSD"), obesity, essential hypertension, lumbosacral

spondylosis, and abnormal liver function.  (Admin. R. (Doc. No. 22) at 213–14, 239, 262.)

Martinez's applications for SSD and SSI benefits were denied.[1]  The Notice of Disapproved

Claim for SSI benefits states that "the reports did not show any condition of a nature that would

prevent [Martinez] from working.  We realize that at present [Martinez is] unable to perform

certain kinds of work.  But based on [her] age of 49 years, [her] education of 12 years, and [her]

experience, [she] can perform light work (for example, [she] could lift a maximum of 20 lbs.,

with frequent lifting or carrying of objects weighing up to 10 lbs., or walk or stand for much of

the working day)."  (*Id.* at 124.)  In response to this decision, Martinez requested a hearing

before an ALJ.  (*Id.* at 120–28.)

    On July 16, 2012, Martinez appeared before ALJ Kieran McCormack, and the hearing

was adjourned to provide Martinez the opportunity to obtain counsel.  (*Id.* at 82–93.)  She

appeared with her attorney at a continued hearing on February 20, 2014.  (*Id.* at 20–81.)  In a

decision dated March 25, 2014, the ALJ found Martinez not disabled.  (*Id.* at 96–115.)  He found

that although Martinez suffered from several impairments – history of asthma, hypertension,

status-post cholecystectomy, radiculopathy, bipolar disorder, and anxiety disorder – and although

Martinez was unable to perform her previous work due to her impairments, "the claimant is

capable of making a successful adjustment to other work that exists in significant numbers in the

national economy."  (*Id.* at 101, 109–110.)  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied Martinez's request for review on April 24,

2015.  (*Id.* at 1–6.)

    On June 22, 2015, Martinez filed the instant action alleging that the ALJ's decision "was

erroneous, not supported by substantial evidence on the record and/or contrary to the law."

---

[1] Martinez's application for SSD benefits was denied because she had not worked long enough to be insured.  (*Id.* at 116–19.)  The Court has received no indication that Martinez appealed that determination, and the instant action does not relate to the claim for SSD benefits.

(Compl. at 3.) The Commissioner maintains that the ALJ's determination was based upon proper evaluation of the evidence. (Def.'s Mem. Mot. (Doc. No. 20) at 21–34.) Both Martinez and the Commissioner have filed motions for judgement on the pleadings. (Pl.'s Cross-Mot. J.; Def.'s Mot. J.)

## II. Administrative Record

### a. Non-Medical Evidence

Martinez was born in 1963, and she has a general equivalency diploma. (Admin. R. at 58–59, 263.) She was self-employed from 2006 to 2009 as a babysitter. (*Id.* at 32–33, 253.) Martinez reported that during that time, she also worked for an elderly man, caring for him and cleaning his house. (*Id.* at 33.) She reported that in 2009, while doing the latter job, she fell and hurt her back and legs, and did not work thereafter. (*Id.* at 33–34, 59.)

In a disability report dated March 12, 2012, Martinez stated that she lived with family in an apartment. (*Id.* at 241.) Every day, she took a shower (while seated), watched television, and read. (*Id.* at 241, 254.) She sometimes forgot to take her many medications. (*Id.* at 243.) Martinez reported that she "fixed" her bed, was "limited" in washing the dishes, and received help doing laundry, cleaning the bathroom, sweeping, cooking, and food shopping. (*Id.* at 244.) She went out only for doctor appointments, and she never went out alone because she was worried that she might fall. (*Id.* at 244–46.) She said she had, in the past, fallen on the way to the bus stop and while walking down stairs. (*Id.* at 245.) Martinez reported that she could pay bills and handle a bank account, and manage her financial affairs. (*Id.*) She reported that she rarely left home and had no social life due to issues with her legs and back. (*Id.* at 246.) She said she had no problems paying attention, following spoken and written instructions, and remembering things. (*Id.* at 248–49.) She got along with people in positions of authority, except

her landlord.  (*Id.* at 248.)

In her March 12, 2012 disability report, Martinez further stated that she could not stand for long periods and often lost her balance.  (*Id.* at 243, 246.)  Her back and legs, which "just give up," kept her from doing things.  (*Id.* at 244.)  She said she could not lift objects or bend over.  (*Id.* at 246.)  She could only walk for one-half block, and needed someone with her to do so.  (*Id.* at 246–47.)  Climbing stairs was difficult, and she would not do it unless she had one person in front of her and another behind her.  (*Id.* at 247.)  Martinez reported that while she did not have any issues with her hands, she could not kneel, squat, or reach.  (*Id.*)  She said her sight was getting worse.  (*Id.*)  She wore glasses and used a cane.  (*Id.* at 248.)  She reported that she used an inhaler for asthma and had never been hospitalized for it.  (*Id.* at 249–50.)

Martinez said that she had anxiety because she was molested by her father when she was six and had been in an abusive relationship as an adult.  (*Id* at 250.)  Martinez said she experienced flashbacks of the abuse, accompanied by rapid heartbeat, anger, confusion, and fear.  (*Id.*)  When she had an anxiety attack, she took her medications (Clonazepam,[2] Risperdal,[3] and Lexapro[4]) and stayed in her room.  (*Id.* at 251.)  She said that she needed someone with her at all times.  (*Id.*)

Alan Zebek, Martinez's case manager at WeCARE – the New York City Human Resources Administration's Wellness, Comprehensive Assessment, Rehabilitation and

---

[2] Clonazepam, commonly sold under the brand name Klonopin, is a benzodiazepine used to treat panic disorders, including agoraphobia, in adults.  DRUGS.COM, https://www.drugs.com/clonazepam.html (last visited Dec. 12, 2016.)

[3] Risperdal, the brand name for the prescription drug risperidone, is an antipsychotic medicine used to treat symptoms of bipolar disorder.  DRUGS.COM, https://www.drugs.com/risperdal.html (last visited Dec. 12, 2016.)

[4] Lexapro, a brand name of the generic prescription drug escitalopram, is an antidepressant belonging to a group of drugs called selective serotonin reuptake inhibitors ("SSRIs"), and is used to treat anxiety and major depression.  DRUGS.COM, https://www.drugs.com/lexapro.html (last visited Dec. 12, 2016.)

Employment program – was assisting her in applying for SSI benefits.  Zebek completed a third-party function report dated February 9, 2012.  (*Id.* at 229–38, 278–87.)  He stated that Martinez needed help showering and putting on her shoes.  (*Id.* at 229, 230.)  Zebek reported that Martinez said she had difficulty going up and down stairs.  (*Id.* at 229.)  Most of her day was spent in the house watching television and reading fiction and newspapers.  (*Id.* at 229, 233.)  Family members and friends did all the chores.  (*Id.* at 229, 231.)  She talked to her friends and family on the phone or had them over to her apartment.  (*Id.* at 229, 233.)  Martinez went to psychotherapy once a week, unless her pain was too severe.  (*Id.* at 229.)  She told Zebek that she woke up every two hours due to pain, racing thoughts, and hallucinations.  (*Id.* at 229, 230.)  When she was depressed, she did not comb her hair.  (*Id.* at 230.)

Zebek reported that Martinez was able to go out alone by foot, by car, or on public transportation, though she preferred to avoid public transportation during rush hour due to anxiety.  (*Id.* at 232.)  He also reported that she preferred to travel with an escort.  (*Id.* at 233–34.)  Although she could count change, she had difficulty managing finances; Martinez said she had difficulty with simple math.  (*Id.*)  She reportedly had difficulty performing the following activities due to pain, shortness of breath, and mood swings: lifting, bending, standing, walking, sitting, kneeling, climbing stairs, seeing, remembering things, completing tasks, concentrating, following instructions, and getting along with others.  (*Id.* at 234.)  Zebek reported that Martinez had no problems following written instructions and that she could pay attention for twenty minutes.  (*Id.*)  She could walk one-half block before stopping for ten minutes to rest.  (*Id.*)  Zebek reported that Martinez said she had some trouble with authority figures and distrusted people in power.  (*Id.* at 235.)  She reported that she could not handle stress well.  (*Id.*)  She cried, had panic and anxiety attacks, and hurt herself.  (*Id.*)  Martinez cried during her intake

meeting with Zebek. (*Id.*) She used a walker and cane for mobility and support, and wore

glasses. (*Id.*) Zebek reviewed and summarized medical evidence collected by WeCARE before

and after Martinez's alleged onset date (January 1, 2010), and he stated that Martinez met SSI

listings 1.04 (disorders of the spine), 12.04 (affective disorders), and 12.06 (anxiety-related

disorders). (*Id.* at 236–37.)

Martinez testified at the hearing held on February 20, 2014 that she had back problems,

hypertension, and asthma, and had recently had her gallbladder removed. (*Id.* at 35.) Martinez

said she had to urinate frequently since the surgery. (*Id.* at 60–63.) She had stopped babysitting

in 2009 due to pain in her lower back that radiated down her legs. (*Id.* at 36, 56.) She stated that

she could not pick up things or stand "too long." (*Id.* at 36.) She claimed that her legs "give

out," and she was constantly falling. (*Id.* at 36, 50, 56.) Her doctor had prescribed Tramadol[5]

and Lyrica.[6] (*Id.* at 36–37.) Martinez said she used a cane every day. (*Id.* at 56.) She had

hypertension, but did not like the medication prescribed for it. (*Id.* at 37.) She described her

asthma as generally stable, although she stated that she would have problems in an environment

with a lot of pollen or dust. (*Id.* at 37–38.) She used an inhaler. (*Id.* at 38.) She smoked half a

pack of cigarettes a day. (*Id.* at 38–39.)

Martinez stated that she had suffered from bipolar disorder and anxiety for the past

twenty years. (*Id.* at 39–40.) She said that she had to stop working because her psychological

symptoms and the pain in her legs worsened. (*Id.* at 40.) Martinez testified that her symptoms

included becoming angry, throwing things, screaming, and "blank[ing] out." (*Id.* at 40–41, 57.)

---

[5] Tramadol is a narcotic-like pain medication used to treat severe pain. DRUGS.COM,
https://www.drugs.com/tramadol.html (last visited Dec. 12, 2016.)

[6] Lyrica, also sold under the generic name pregabalin, is an anti-seizure medication that also can be used to treat
nerve pain. DRUGS.COM, https://www.drugs.com/lyrica.html (last visited Dec. 12, 2016.)

She said that Zoloft[7] helped, and that her dosage had been increased to better treat her mental health problems.  (*Id.* at 41.)  When questioned by the ALJ as to why she was currently being treated at a methadone clinic, she claimed that in 1983, she became addicted by ingesting methadone that her ex-husband kept in their home.  (*Id.* at 41–46.)  Martinez said that she stopped taking it when she got pregnant in 1989 and had been in a drug treatment program ever since.  (*Id.* at 44–46.)  She attended the program Monday through Friday and was "in and out" in ten minutes.  (*Id.* at 45.)  Martinez denied using heroin.  (*Id.* at 41.)  She stated that she smoked marijuana one month prior to the hearing.  (*Id.* at 47.)

Martinez testified that she showered daily (using a seat), and took a cab to her methadone clinic and public transportation home.  (*Id.* at 49–50, 51, 53.)  She said she could use public transportation if someone accompanied her.  (*Id.* at 53.)  She reported that she normally spent the rest of the day in bed watching television.  (*Id.* at 50–51.)  She stated that she had fallen while cleaning, and her children did not want her to do chores.  (*Id.* at 50.)  Martinez said that her brother and sons did all the shopping, laundry, and household chores.  (*Id.* at 50–52.)  She then stated that she did some cooking and washing dishes while sitting down.  (*Id.* at 52.)  Martinez reported that she had a cell phone and a computer, and maintained email and Facebook accounts. (*Id.* at 53.)

### b.  Medical Evidence Prior to Plaintiff's SSI Benefits Application

### i.  Interfaith Medical Center – October 2000–August 2010

Before making her SSI benefits application, Martinez was treated for opiate/heroin dependency at Interfaith Medical Center ("Interfaith"), where she received methadone

---

[7] Zoloft is an SSRI.  It is used to treat depression, obsessive-compulsive disorder, panic disorder, anxiety disorders, PTSD, and premenstrual dysphoric disorder ("PMDD").  DRUGS.COM, https://www.drugs.com/zoloft.html (last visited Dec. 12, 2016.)

maintenance, counseling, and primary health care services.  (*See, e.g.*, *id.* at 339, 341, 385, 395, 396, 398.)  Martinez reported that she began using heroin at the age of eighteen.  (*Id.* at 333.)  She stated that "she was tired of using heroin."  (*Id.* at 331.)  She denied experiencing any sexual or physical abuse as a child or adult.  (*Id.* at 335.)  She said that she got along well with her family and others.  (*Id.* at 334, 336.)  In 2004, no behavior or emotional problems were noted.  (*Id.* at 339.)

Interfaith records from 2010 indicate that Martinez was being treated elsewhere for anxiety and depression.  (*Id.* at 343, 345.)  In January of 2010, she reportedly was noncompliant and shouted when told to increase her visits to six times per week from five.  (*Id.* at 355.)  Because Martinez was missing appointments for methadone maintenance dosages, pick-up by taxi was authorized.  (*Id.* at 349–50.)

On March 9, 2010, Martinez underwent a pelvic sonogram and an electrocardiogram ("EKG") after complaining of pelvic pain.  (*Id.* at 542.)  Those exams revealed a cystic structure and possible small fibroid.  (*Id.*)  X-rays of Martinez's lumbosacral spine on March 15, 2010 were normal.  (*Id.* at 540.)  X-rays of her foot revealed bilateral calcaneal spurs and hallux valgus deformity.  (*Id.* at 541.)  Her methadone dosing schedule was reduced to five visits per week in August 2010 as a result of compliance.  (*Id.* at 350.)  Martinez reported in her counseling sessions that she had no emotional problems but was not engaged in "any meaningful endeavor" and had no work history.  (*See id.* at 351, 353–55.)

### ii.  WeCARE – August 2008–February 2012

In August 2008, Martinez was evaluated at WeCARE.  (*Id.* at 294–303, 428–55.)  She traveled independently by bus to the appointment.  (*Id.* at 443.)  At the intake, she stated, *inter alia*, that she had not worked since 1983, and she denied any past or current drug use or

treatment.  (*Id.* at 296, 445, 446.)  Martinez reported a history of parental abuse and domestic violence.  (*Id.* at 447.)  She said that she was experiencing symptoms of depression due to the death of her mother in April 2008.  (*Id.* at 444.)  She reported that she heard voices, saw visions of her father, and was paranoid.  (*Id.* at 296.)  Martinez stated that she washed dishes and clothes, swept and vacuumed the floor, made beds, shopped for groceries, cooked meals, watched television, read, socialized, and crocheted.  (*Id.* at 447–48.)  She said she could not work due to hand and leg problems.  (*Id.* at 448.)  Nancy Flores, M.D., a psychiatrist, assessed Martinez as psychotic and thought disordered and diagnosed mood disorder not otherwise specified ("NOS"), as well as PTSD.  (*See id.* at 294–300.)  Dr. Flores wrote that Martinez demonstrated poor attention, registration, and concentration when doing tasks, and was unable to function in a work setting.  (*Id.* at 299.)  She opined that Martinez was permanently disabled.  (*Id.*)  After both mental and physical examinations, Martinez was diagnosed with lower back pain, hypertension, chronic obstructive pulmonary disease, PTSD, schizoaffective disorder, and depression.  (*Id.* at 454.)  Ilya Smuglin, M.D., opined that Martinez was "temporarily unemployable" due to psychosis and thought disorder, per Dr. Flores's assessment.  (*Id.* at 454.)

Martinez was reevaluated at WeCARE in August 2010.  (*See id.* at 305–13, 428–41.)  At her mental health intake, she said that she did not remember her last paid employment.  (*Id.* at 431.)  At her physical medical intake, she stated that she had worked as a child care provider for six years and stopped in 2009.  (*Id.* at 307.)  She said she had no history of using illegal substances and was not in drug treatment.  (*Id.* at 307, 433, 437.)  Martinez said that she had undergone outpatient psychiatric treatment for 23 years, but not since 2004.  (*Id.* at 308, 309.)  She stated that she was not experiencing any symptoms of depression.  (*Id.* at 308–09, 430.)  Martinez reported that she washed dishes and clothes, swept and mopped the floor, made beds,

shopped for groceries, cooked meals, watched television, read, and socialized.  (*Id.* at 434.)  She said that she also spent her days assisting elderly couples.  (*Id.*)  She reported that she could travel by bus or train, without assistance.  (*Id.* at 309.)  Martinez reported having back pain, bilateral leg pain/numbness (mostly on the right side), hypertension, asthma, and depression.  (*Id.* at 310.)  She used a cane.  (*Id.*)  She said that her inability to work was based on bilateral leg pain that affected her ability to stand and walk.  (*Id.*)

As part of the WeCARE reevaluation, Eddy Cadet, M.D., diagnosed: possible lumbosacral radiculopathy with mild functional impairment, rule/out peripheral artery disease with mild functional impairment, peripheral venous insufficiency with mild functional impairment, asthma that was mild/intermittent and stable, and a history of controlled depression.  (*Id.* at 440; *see id.* at 428–41.)  He opined that Martinez should limit, or possibly eliminate, lifting, pushing, pulling, carrying, stooping, bending, and reaching due to backache, but he stated that she was otherwise able to do light work.  (*Id.* at 440–41.)

Martinez returned to WeCARE on February 7, 2012.  (*Id.* at 413–27.)  She traveled independently to the appointment by bus.  (*Id.* at 414.)  She was using a cane.  (*Id.*)  Martinez reported that she had previously endured physical abuse by her late husband, who had died during an altercation with her.  (*Id.* at 415.)  She said she was not jailed because "it was out of self-defense."  (*Id.*)  She reported that she had been treated over at least the previous two years for bipolar disorder, depression, claustrophobia, and anxiety.  (*Id.* at 414, 420.)  She saw a therapist weekly and a psychiatrist monthly and said that talking to the therapist helped her "a lot."  (*Id.* at 415.)  Her anxiety was improved with medication.  (*Id.* at 421.)  She denied having any drug history.  (*Id.* at 418, 422.)  Martinez said she had last worked as a babysitter in 2011 and that since then, her medical conditions prevented her from working.  (*Id.* at 416.)  She also

reported having back pain that radiated to her legs and caused her to fall, high blood pressure, and asthma. (*Id.* at 420, 421.) On examination, Sundararaja Chandrasekaran, M.D., classified Martinez as obese, with a Body Mass Index ("BMI") of 39.[8] (*Id.* at 424.) Plaintiff had non-specific leg tenderness, with restriction of knee flexion, as well as non-specific sensory loss, with no anatomic correlation, in both legs. (*Id.*) Straight leg raising was positive at 50 degrees. (*Id.*) Dr. Chandrasekaran diagnosed: PTSD by history, unstable; obesity, stable; essential hypertension, unspecified, stable; asthma, unspecified, stable; lumbosacral spondylosis without myelopathy, unstable; other abnormal glucose, stable; bipolar disorder/depression; and abnormal liver function. (*Id.* at 426.) She referred Martinez to a psychiatrist for further evaluation and opined that Martinez was unable to work. (*Id.* at 425, 427.)

Thomas Kranjac, M.D., a WeCARE psychiatrist, examined Martinez on the same day. (*Id.* at 463–72.) Martinez told him that she traveled to the examination with a friend because she was afraid of fainting. (*Id.* at 464.) Martinez complained of: mood swings, depressed mood, poor concentration, panic, rapid heartbeat, fear of going outside, insomnia, anxiety/fearfulness, fatigue, crying, suicidal thoughts, forgetfulness, flashbacks, irritability, yelling at people, racing thoughts, and hearing voices. (*Id.* at 464–65.) On mental status examination, Martinez was neat and calm. (*Id.* at 466.) Her affect was constricted, and her mood was depressed. (*Id.*) She reported experiencing auditory hallucinations, obsessions, and suicidal ideations. (*Id.*) Her speech was normal, and her thought was logical. (*Id.*) Dr. Kranjac said Martinez had difficulty with mobility and used a cane. (*Id.*) He diagnosed: bipolar disorder, NOS; panic disorder with

---

[8] BMI is a person's weight in kilograms divided by the square of his or her height in meters. CENTERS FOR DISEASE CONTROL AND PREVENTION https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/ (last visited Dec. 7, 2016.) In general, BMI is an inexpensive and easy-to-determine measure of weight category – namely, underweight, normal or healthy weight, overweight, and obese. *Id.* A BMI of 30.0 or above is an indicator that a patient is obese. *Id.*

agoraphobia; and PTSD. (*Id.* at 468.) He assessed a Global Assessment of Functioning ("GAF") score of 50.[9] (*Id.*) Dr. Kranjac assessed that Martinez had moderate functional impairments in: ability to follow work rules; relating to co-workers; accepting supervision; adapting to change; dealing with the public; and maintaining attention. (*Id.* at 467.) He opined that Martinez would have severe impairments in adapting to stressful situations and stated that Martinez needed a lower stress environment and non-rush hour travel accommodations. (*Id.*) Dr. Kranjac also stated that Martinez was unable to work for at least twelve months due to incompletely treated mental disorders. (*See id.* at 426–27, 469–70.)

### iii. Cumberland Diagnostic and Treatment Center – August 2008

Martinez had a routine physical exam at Cumberland Diagnostic and Treatment Center in August 2008, which produced unremarkable results. (*See id.* at 315–22.)

### iv. Kingsbrook Jewish Medical Center – May–June 2011

On May 11, 2011, Martinez went to the Kingsbrook Jewish Medical Center emergency department complaining of left knee swelling and pain after falling on the sidewalk five days earlier. (*Id.* at 627–37.) She noted a history of previous falls. (*Id.* at 630.) She denied experiencing depression or visual or auditory hallucinations. (*Id.* at 628–29.) Her mental status examination was normal. (*Id.* at 629, 630.) Her left knee X-rays were unremarkable. (*Id.* at 633.) Martinez returned on June 20, 2011 complaining of dizziness, shortness of breath, and bilateral leg edema. (*Id.* at 614–626.) Her mental status examination again was normal. (*Id.* at 617.) She did not present with back tenderness, and there was mild edema in her legs. (*Id.*) Her lungs were clear. (*Id.*) Martinez was diagnosed with benign paroxysmal vertigo and edema. (*Id.*

---

[9] GAF is a rating of overall psychological functioning on a scale of 0 to 100. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders-Text Revision* 34 (4th ed., rev. 2000) ("DSM-IV"). A GAF of 41 to 50 reflects "[s]erious symptoms" or "any serious impairment in social, occupational, or school functioning." *Id.*

at 619.)

### v.  Preferred Health Partners – February–October 2011

On February 24, 2011, Martinez was examined at Preferred Health Partners ("PHP"), complaining of anxiety.  (*Id.* at 400–01).  She was diagnosed with: anxiety, unspecified; and chronic and essential hypertension, unspecified and stable.  (*Id.* at 401.)

Plaintiff returned to PHP on October 5, 2011, complaining of hypertension and pain in her lower back radiating to both legs.  (*Id.* at 402–04.)  Rose Yves-Lyne Daniel, M.D., diagnosed: unspecified essential hypertension; low back pain radiating to both legs, chronic; and anxiety state, unspecified.  (*Id.* at 404.)

### vi.  Community Counseling & Mediation – August 2011

Martinez visited Community Counseling & Mediation ("CCM") on August 22, 2011, for an initial psychiatric evaluation.  (*Id.* at 493–505, 560–66.)  Eli Shalenberg, M.D., a psychiatrist, noted Martinez's psychiatric history, including past domestic abuse.  (*Id.* at 495, 497.)  Martinez admitted to current marijuana use ("to help me relax") and denied having any other drug history. (*Id.* at 496.)  On examination, she was tearful and distraught at times, but her range of affect was broad and reactive.  (*Id.* at 498.)  She was neat, had appropriate affect, and good impulse control. (*Id.*)  Her mood was sad, and her mannerisms were normal.  (*Id.*)  Martinez's memory, recent and remote, was normal.  (*Id.*)  She was alert, and she had normal concentration, thought content, and eye contact.  (*Id.*)  Intellectual functioning was normal; her insight was fair, and her judgment was good.  (*Id.*)  She denied experiencing hallucinations.  (*Id.*)  Dr. Shalenberg assessed that Martinez's major depressive disorder, PTSD, panic disorder, and agoraphobia were fairly well-controlled on Lexapro and Klonopin until she ran out those medications four days prior.  (*Id.* at 497, 499.)  The doctor restarted Martinez on both medications, and he referred her

for psychotherapy.  (*Id.* at 499.)

### c.  Medical Evidence After Alleged Onset Date

#### i.  Wycoff Heights Medical Center – February 2012

Martinez was treated in the Wyckoff Heights Medical Center emergency department on February 20, 2012, for head, neck, lower back, and knee pain after tripping and falling down steps at home.  (*See id.* at 639–43, 650–53.)  Left knee X-rays showed degenerative changes but no evidence of acute distress or fracture.  (*Id.* at 644.)  Lumbosacral spine X-rays were unremarkable.  (*Id.* at 645.)  A brain CT-scan was normal; a CT scan of the cervical spine showed mild degenerative changes but no acute injury.  (*Id.* at 646–49.)  Martinez's discharge diagnosis was accidental fall.  (*Id.* at 642.)  Martinez was given a cane for support, a wrap for her knee, and pain medication, and she was discharged in improved condition.  (*See id.* at 475–77, 639–43.)

#### ii.  Dr. Vinod Thukral, Consultative Examiner – March 2012

On March 30, 2012, Vinod Thukral, M.D., performed a consultative internal medicine examination.  (*Id.* at 483–87.)  Martinez reported histories of hypertension without complications since 2005 and asthma relieved by an inhaler since 1994.  (*Id.* at 483.)  She said she experienced "on and off" lower back pain over the previous four years, with an exacerbation two months earlier when she slipped and fell.  (*Id.*)  Martinez said she had decreased vision due to glaucoma in both eyes.  (*Id.*)  She also reported a twenty-year history of anxiety, bipolar disorder, claustrophobia, and depression.  (*Id.*)  She reported that she took the following medications:

Clonazepam, Risperidone, Divalproex,[10] Citalopram,[11] Clonidine,[12] Lasix,[13] and Lyrica. (*Id.* at 484.) Martinez said that she smoked a half-pack of cigarettes per day and denied any alcohol or drug abuse. (*Id.*) She lived with her two sons, ages seventeen and twenty-one, and said that due to her back pain, her sons or brother did the cooking, cleaning, laundry, and shopping. (*Id.*) She showered and dressed daily, watched television, read, and went to doctors' appointments. (*Id.*)

Physical examination showed that Martinez was five feet and two inches tall and weighed 220 pounds. (*Id.* at 484.) Her blood pressure was 124/70.[14] (*Id.*) In addition, her corrected vision was 20/50 using both eyes.[15] (*Id.* at 485.) Martinez brought a cane to the examination, stating that her doctor gave it to her two months earlier due to back pain. (*Id.*) Her gait was normal with and without the cane. (*Id.*) She was unable to walk on her heels and toes or squat, due to back pain. (*Id.*) Her stance was normal. (*Id.*) Martinez needed no help changing for the

---

[10] Divalproex sodium is used to treat seizure disorders, manic episodes related to bipolar disorder (manic depression), and to prevent migraine headaches. DRUGS.COM, https://www.drugs.com/mtm/divalproex-sodium.html (last visited Nov. 18, 2016).

[11] Citalopram is an SSRI commonly used to treat depression. DRUGS.COM, https://www.drugs.com/citalopram.html (last visited Nov. 18, 2016).

[12] Clonidine is used to treat hypertension and attention deficit hyperactivity disorder ("ADHD"). DRUGS.COM, https://www.drugs.com/clonidine.html (last visited Nov. 18, 2016).

[13] Lasix (furosemide) is a loop diuretic (water pill) that prevents the body from absorbing too much salt. DRUGS.COM, https://www.drugs.com/lasix.html (last visited Nov. 18, 2016). This allows the salt to instead be passed in urine. *Id.* Lasix is used to treat fluid retention (edema) in people with congestive heart failure, liver disease, or a kidney disorder such as nephrotic syndrome. *Id.* Lasix is also used to treat high blood pressure (hypertension). *Id.*

[14] The American Heart Association defines normal blood pressure as a systolic reading below 120 and a diastolic reading below 80. AMERICAN HEART ASSOCIATION, http://www.heart.org/HEARTORG/Conditions/HighBloodPressure/AboutHighBloodPressure/Understanding-Blood-Pressure-Readings_UCM_301764_Article.jsp#.V9MZiPkrLcs (last visited Dec. 12, 2016). A systolic reading of 120–129 or a diastolic reading of 80–89 indicates prehypertension. *Id.* A systolic reading above 130 or a diastolic reading above 90 indicates hypertension; a systolic reading above 180 or a diastolic reading above 110 indicates that the patient in is hypertensive crisis. *Id.*

[15] Anyone with noncorrectable reduced vision is visually impaired. When the vision in the better eye with the best possible glasses correction is 20/30 to 20/60, the patient is considered to have mild vision loss, or near-normal vision. AMERICAN OPTOMETRIC ASSOCIATION, http://www.aoa.org/patients-and-public/caring-for-your-vision/low-vision?sso=y (last visited Dec. 7, 2016).

examination or getting on and off the table.  (*Id.*)  Using the cane, she was able to rise from a chair.  (*Id.*)  Her chest and lungs were clear to auscultation, and percussion was normal.  (*Id.*)  She exhibited full range of motion in the cervical spine, hips, knees, and ankles.  (*Id.* at 486.)  Ranges of motion in the lumbar spine were: flexion to 40 degrees, extension to 20 degrees, and bilateral lateral rotation and flexion to 20 degrees.  (*Id.*)  Straight leg raising was negative bilaterally.  (*Id.*)  All joints were stable and non-tender, with no evident abnormalities.  (*Id.*)  There were no sensory, motor, or reflex deficits.  (*Id.*)  Hand and finger dexterity was intact, and grip strength was full (5/5) bilaterally.  (*Id.*)  On mental status examination, Martinez was dressed appropriately and maintained good eye contact.  (*Id.*)  She was oriented to time and place.  (*Id.*)  There was no evidence of impaired judgment or significant memory impairment.  (*Id.*)  Affect was normal.  (*Id.*)  X-rays of the lumbosacral spine were unremarkable.  (*Id.* at 482, 486.)  Dr. Thukral diagnosed by history: hypertension, asthma, lower backache, decreased visual acuity in both eyes due to glaucoma, anxiety, bipolar disorder, claustrophobia, and depression (on treatment).  (*Id.* at 486–87.)  He opined that Martinez had no limitation in sitting, but had moderate limitations in standing for a long time, bending, pulling, pushing, lifting, carrying, and performing other related activities, due to lower backache.  (*Id.* at 487.)  He opined that Martinez needed to avoid smoke, dust, and other respiratory irritants due to her history of asthma.  (*Id.*)

### iii.  Dr. Robert Lancer, Consultative Examiner – March 2012

On March 30, 2012, Robert Lancer, Psy.D., conducted a consultative psychiatric evaluation.  (*Id.* at 478–81.)  At the time, Martinez reported seeing a psychiatrist once per month for fifteen minutes and a psychologist once per week for one hour.  (*Id.* at 478.)  She reported being hospitalized in 1982 due to a drug overdose and bipolar disorder.  (*Id.*)  She stated that she previously worked for three years as a babysitter, and stopped in 2009 due to problems with her

legs.  (*Id.*)  Martinez traveled to the examination by bus.  (*Id.*)  She reported that she dressed, bathed, and groomed herself independently, and that she shopped, managed money, and took public transportation.  (*Id.*)  She said that she could not cook, clean, or do laundry due to pain in her legs.  (*Id.*)  She socialized with her brother and sister and spent her days watching television and listening to the radio.  (*Id.*)  Martinez stated that she had difficulty sleeping and experienced dysphoric moods, hopelessness, social withdrawal, worthlessness, excessive apprehension, fatigue, and restlessness.  (*Id.* at 478.)  She denied having panic attacks, mania, thought disorder, or cognitive symptomatology.  (*Id.)*  She denied any history of drug or alcohol abuse.  (*Id.*)

On mental status examination by Dr. Lancer, Martinez demonstrated adequate manner of relating, social skills, and overall presentation.  (*Id.* at 479.)  She was dressed appropriately and well groomed.  (*Id.*)  She wore glasses and used a cane.  (*Id.*)  Her posture, motor behavior, and eye contact were appropriate.  (*Id.*)  Her expressive and receptive language was adequate, and her thought processes were coherent and goal-oriented.  (*Id.*)  Martinez's affect was of full range, and her speech and thought content were appropriate.  (*Id.*)  Her mood was neutral, and she was oriented to person, time, and place.  (*Id.*)  Martinez's attention and concentration were mildly impaired, due to limited intellectual functioning; she was unable to do simple calculations or count by threes.  (*Id.* at 479–80.)  Her recent and remote memory skills were intact, and her insight and judgment were fair.  (*Id.* at 480.)  Dr. Lancer diagnosed anxiety disorder, NOS and depressive disorder, NOS.  (*Id.*)  He opined that Martinez could follow and understand simple directions and instructions and could perform simple tasks independently.  (*Id.*)  She had some difficulty maintaining attention and concentration.  (*Id.*)  Due to issues related to her legs, Martinez had some difficulty getting around and maintaining a regular schedule.  (*Id.*)  She could learn new tasks, perform complex tasks independently, make appropriate decisions, and

relate adequately with others.  (*Id.*)  Martinez had difficulty dealing with stress appropriately due to anxiety disorder.  (*Id.*)  Dr. Lancer opined that "the results of the examination appear to be consistent with psychiatric problems, and this may significantly interfere with the claimant's ability to function on a daily basis."  (*Id.*)

### iv.  Return to Community Counseling & Mediation – April 2012–August 2013

Martinez returned to Dr. Shalenberg of CCM on April 16, 2012 and reported that she was feeling "a little better" and was no longer depressed.  (*Id.* at 492.)  Findings on her mental status examination were generally normal.  (*Id.*)  Dr. Shalenberg noted that Martinez's affect was improved, and he described her as more stable.  (*Id.*)  He assessed her bipolar disorder as "fairly well controlled," and her intermittent depression as improved.  (*Id.*)  Klonopin and Risperdal were continued.  (*Id.*)

On April 25, 2012, Dr. Shalenberg completed a questionnaire about Martinez.  (*Id.* at 488–91.)  Martinez weighed 185 pounds.  (*Id.* at 488.)  Her hypertension was stable. (*Id.*)  She was diagnosed with bipolar disorder and benign vertigo.  (*Id.*)  Martinez had a history of depression with psychotic features, anxiety, and visual/auditory hallucinations.  (*Id.* at 488–89.)  Dr. Shalenberg noted that her bipolar disorder was fairly well controlled, although she was mildly depressed.  (*Id.* at 489.)  The doctor noted that Ms. Martinez's brother helped her cook and clean because of leg pain and difficulty standing.  (*Id.* at 490.)  Martinez spent most of her time indoors, was unemployed, and socialized with family when they visited.  (*Id.*)  Under the prompt, "based on the medical findings provided in my report, my medical opinion regarding this individual's ability to do work related mental activities is as follows," Dr. Shalenberg wrote, "n/a."  (*Id.*)

When Martinez next saw Dr. Shalenberg on May 14, 2012, she reported that she had

"been okay." (*Id.* at 967.) She reported that she had stopped taking her medications for her anxiety and mood disorders for one day and noticed increased symptoms, but her mood quickly stabilized upon resuming her medications. (*Id.*) Dr. Shalenberg's mental status examination findings were normal. (*Id.*) He described Martinez as "smiley" and "pleasant." (*Id.*)

On June 11, 2012, Martinez told Le-Ben Wan, M.D., Dr. Shalenberg's colleague at CCM, that her mood had improved. (*Id.* at 966.) Dr. Wan's mental status examination findings were normal. (*Id.*)

On July 9, 2012, Dr. Wan noted that Martinez was depressed due to "multiple social stressors." (*Id.* at 965.) His examination revealed a dysphoric mood but was otherwise unremarkable. (*Id.*) He prescribed Zoloft. (*Id.*) Dr. Wan examined Martinez again the next month and reported on August 20, 2012 that the examination findings were normal, although Martinez reported feeling irritable and stated that she had not been taking Risperdal due to insurance problems. (*Id.* at 964.)

Dr. Wan noted mild mood swings on November 14, after Martinez reported she had run out of Klonopin. (*Id.* at 961.) Dr. Wan's mental status examination findings were otherwise unremarkable from September 2012 through April 2013. (*Id.* at 957–63.) Periodically, Martinez ran out of one of her psychotropic medications and re-stabilized upon resuming it. (*See, e.g.*, *id.* at 958, 961.)

On May 18, 2013, Martinez saw Mari Kurahashi, M.D., another psychiatrist at CCM. (*Id.* at 559, 956.) Martinez denied experiencing anxiety but reported recently engaging in some superficial cutting on her forearms. (*Id.*) She said that her attention span was short. (*Id.*) Martinez stated that medications had been helpful for her mood, and denied any side effects. (*Id.*) Her weight was down to 145 pounds, from 240 pounds, and Dr. Kurahashi made a note to

monitor Martinez's weight loss. (*Id.*) Martinez also reported that she was cleaning excessively. (*Id.*) On examination, Martinez's speech was fast, and her mood was anxious. (*Id.*) The doctor's findings were otherwise unremarkable. (*Id.*) Dr. Kurahashi prescribed Ambien, increased the dosage of Zoloft, and continued Klonopin and Risperdal. (*Id.*)

Martinez continued to see Dr. Kurahashi monthly, and from June through August 2013, her mental status examination findings remained mostly unchanged. (*Id.* at 953–55.) Martinez reported having a happy mood and normal energy level, though she complained of diminished appetite. (*Id.*) In July and August, she reported having a normal sleep cycle. (*Id.* at 953–54.) Martinez generally experienced improvement in her symptoms associated with therapy and medication (Klonopin, Risperdal, Ambien,[16] and Zoloft), with no side effects. (*Id.* at 953–55.) Martinez was advised that discontinuing medication could lead to seizures. (*Id.* at 953.) She thus was encouraged to continue taking medication. (*Id.*) At all mental status examinations, Martinez was calm, cooperative, and well groomed. (*Id.* at 953–54.) She related well and exhibited good eye contact. (*Id.*) She was alert and fully oriented. (*Id.*) Her cognition and memory were grossly intact. (*Id.*) She was attentive and had no abnormal movements. (*Id.*) Her speech was fast, and her mood was anxious, but her thought content was normal. (*Id.*) Her insight, judgment, and impulse control were fair. (*Id.*) At the July session, Martinez reported that she was doing less compulsive cleaning. (*Id.*) At the August session, she reported that her medications and psychotherapy were helping her to manage and cope with her anger. (*Id.*)

### v. Interfaith Medical Center – April 2012–September 2013

Martinez continued attending the methadone maintenance program at Interfaith in 2012, receiving medication and therapy, and undergoing routine physical examinations. (*See id.* at

---

[16] Ambien (zolpidem) is a sedative used to treat insomnia. DRUGS.COM, https://www.drugs.com/ambien.html (last visited Dec. 12, 2016).

534–46.)  In April and May of 2012, she was cordial and fully oriented, and she denied having

any suicidal or homicidal ideations.  (*Id.* at 534–35.)

On September 14, 2012, Martinez saw Sajjad Mohammad, M.D., at Interfaith for an

annual physical examination.  (*Id.* at 544–46.)  Dr. Mohammad noted no abnormalities.  (*Id.* at

545.)  Plaintiff reported that she was not in pain.  (*Id.*)  Dr. Mohammad diagnosed continuous

opioid dependence, hypertension, obesity, asthma, and anxiety.  (*Id.* at 544.)

Plaintiff continued to receive methadone administration and counseling at Interfaith from

September 3, 2013 through January 21, 2014.  (*Id.* at 871–951.)  At a September 12, 2013

physical examination, Plaintiff weighed 166 pounds, and her blood pressure was 140/80.  (*Id.* at

941–44.)  Nisarul Haque, M.D., diagnosed continuous opioid dependence, hypertension, asthma

in remission, obesity, and adjustment disorder.  (*Id.* at 941, 943.)

### vi.  Dr. J. Kessel, Consultative Examiner – June 2012

On June 26, 2012, J. Kessel, M.D., a State Agency psychiatric consultant, reviewed the

record and in a Psychiatric Review Technique, (*id.* at 506–19), found that Martinez had mild

limitations in: activities of daily living, maintaining social functioning, and maintaining

concentration, persistence or pace.  (*Id.* at 516.)  Dr. Kessel noted that Martinez had experienced

one or two repeated episodes of deterioration, each of extended duration.  (*Id.*)  In a mental

residual functional capacity ("RFC") assessment, Dr. Kessel opined that Martinez could:

understand, remember, and carry out simple instructions; concentrate adequately; relate

appropriately to coworkers and supervisors; and adapt adequately to changes in the work

environment.  (*Id.* at 520–23.)

### vii.  Woodhull Medical Center – June–September 2013

Martinez was treated at the Woodhull Medical Center ("Woodhull") emergency

department on June 3, 2013.  (*Id.* at 654–76.)  She complained of experiencing an isolated seizure episode.  (*Id.* at 674.)  Discharge diagnosis was abdominal pain.  (*Id.* at 555, 674.)

Martinez went to Woodhull on September 23, 2013, complaining of abdominal pain.  (*Id.* at 677–99.)  She was admitted and underwent a cholecystectomy (removal of the gallbladder) on September 25, after which surgical follow-ups revealed no complications other than a urinary tract infection.  (*Id.* at 700–870.)  On September 24, 2013, Martinez was screened for depression. (*Id.* at 713.)  She reported that she had a history of depression but stated that she had never been in psychiatric care.  (*Id.*)  On the same day, she reported in another examination that she had been hospitalized for psychiatric treatment.  (*Id.* at 726.)  By Saturday, September 28, three days after her surgery, Martinez was eating well and walking "frequently."  (*Id.* at 841.)  She was discharged on Sunday, September 29, 2013, and given Tylenol and Nexium.[17]  (*Id.* at 858.) Martinez complained at her October 22 follow-up examination of abdominal pain and urinary issues, including incontinence, but she did not pursue further testing, as recommended, and instead left the Woodhull clinic against medical advice.  (*Id.* at 867–68.)

### viii.  WeCARE – November 2013

Martinez returned to WeCARE on November 14 and 15, 2013.  (*Id.* at 581–612.)  She traveled independently to the facility by subway.  (*Id.* at 583.)  She had no special travel needs. (*Id.*)  Martinez reported that she had last worked in 2008 as a home attendant.  (*Id.* at 591.)  She stated that she was no longer working due to the following medical issues: hypertension, asthma, a gallbladder surgery performed that September, depression, and bipolar disorder.  (*Id.* at 584–85.)  Martinez reported undergoing mental health treatment at CCM but denied having suicidal or homicidal thoughts, hearing voices, or seeing things.  (*Id.* at 587.)  Martinez said she had no

---

[17] Nexium (esomeprazole) is a proton pump inhibitor that decreases the amount of acid produced in the stomach. DRUGS.COM, https://www.drugs.com/nexium.html (last visited on Dec. 12, 2016).

history of substance abuse or treatment.  (*Id.*)  She reported smoking one-half pack of cigarettes per day.  (*Id.* at 588.)  She stated that she had difficulty standing and walking "for a long period of time" but said that she had no problems related to eyesight, climbing stairs, personal care, preparing meals, or executing housekeeping tasks.  (*Id.*)  She socialized with family and friends. (*Id.* at 590.)  On examination, Mehjabeen Ahmed, M.D., a family practitioner, (*id.* at 612), noted paravertebral tenderness in Martinez's lower back, positive straight leg raising, and painful movements of the spine.  (*Id.* at 605.)  Martinez had difficulty ambulating, walked with a cane, and had difficulty getting on and off the examination table.  (*Id.*)  Neurological and motor strength examinations were normal.  (*Id.* at 606.)  Dr. Ahmed diagnosed: asthma, stable; other and unspecified disorder of the back, unstable; essential hypertension, stable; depressive disorder, NOS; and viral hepatitis, stable.  (*Id.* at 610–11.)  He opined that Martinez was unable to work for at least twelve months and that she needed para-transit services and a travel companion.  (*Id.* at 611–12.)  The doctor said that Martinez suffered from insomnia, poor concentration, crying spells, and a lack of motivation despite medications and psychotherapy. (*Id.* at 612.)

### d.  Vocational Expert Testimony

Vocational expert Karen Ann Simone testified at Martinez's hearing on February 20, 2014.  (*Id.* at 63–75.)  She stated that Martinez's past work as a babysitter was semiskilled and medium in exertion.  (*Id.* at 63.)  The ALJ asked the vocational expert several hypothetical questions involving an individual of the same age, education, and work experience as Martinez. (*Id.* at 64–73.)  The first involved an individual who had an RFC for sedentary work, who could push, pull, climb, balance, stoop, kneel, bend, crouch, and crawl only occasionally.  (*Id.* at 64.) The individual could not work in roles involving concentrated exposure to airborne irritants such

as fumes, odors, dusts, gases, and smoke.  (*Id.*)  She was limited to "low stress jobs," defined as jobs requiring no more than simple work-related decisions with few, if any, workplace changes. (*Id.*)  The VOCATIONAL EXPERT stated that such an individual could not perform Martinez's past work but could perform the following sedentary, unskilled jobs as defined in the *Dictionary of Occupational Titles* ("DOT"), published by the Department of Labor: order clerk, DOT code 209.567-014; charge account clerk, DOT code 205.367-014; and call out operator, DOT code 237.367-014.[18]  (*Id.* at 65.)

The second hypothetical was nearly identical to the first, adding only that the individual was unable to consistently maintain a regular schedule, and had to be off-task by at least ten percent during the workday.  (*Id.* at 65.)  The vocational expert testified that there were no jobs available for that individual.  (*Id.* at 66.)

The third hypothetical involved an RFC for light work with the additional limitations outlined in the first hypothetical.  (*Id.* at 66.)  The vocational expert stated that such an individual could not perform Martinez's past work but could perform the following light, unskilled jobs: "cashier II," DOT code 211.462-010, with 184,111 jobs existing in the national economy; "mail clerk," DOT code 209.687-026, with 7,315 jobs existing in the national economy; and "information clerk," DOT code 237.367-018, with 69,557 jobs existing in the national economy.  (*Id.* at 67–68.)  In response to questioning by Martinez's attorney, the vocational expert testified that the need to use a cane would not impact the ability to work as a mail clerk or information clerk, and would reduce the number of cashier II jobs by 50 percent. (*Id.* at 69–70.)  The vocational expert elaborated that these jobs, considered light because of the lifting requirement and not the standing requirement, could still be done by an individual who

---

[18] The DOT (4th ed., rev'd 1991) is available online at www.oalj.dol.gov/libdot.htm.

needed to sit for the majority of the workday and, therefore, would not be impacted by the use of a cane. (*Id.* at 72–73.) The vocational expert testified that her testimony was consistent with the DOT. (*Id.* at 68.)

## LEGAL STANDARDS

### I.      Standard of Review

The Court does not make an independent judgment about whether a claimant is disabled when reviewing the final determination of the Commissioner. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case, [an ALJ's]

failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.    Eligibility Standard for SSI Benefits

To qualify for SSI benefits, an individual must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(2)(A). This requires a five-step analysis for determining whether a claimant is disabled:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.
>
> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.
>
> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.
>
> [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step. *See Talavera*, 697 F.3d at 151.

# DISCUSSION

## I.     The ALJ's Opinion

The ALJ followed the sequential evaluation process set forth above. (*See* Admin. R. at 101–09.)  At Step One, the ALJ found that Martinez had not engaged in substantial gainful activity since February 9, 2012, when Martinez filed her application for SSI benefits.  (*Id.* at 101.)  At Step Two, the ALJ found the following severe impairments: history of asthma, hypertension, status-post cholecystectomy, lumbar radiculopathy, a bipolar disorder, and an anxiety disorder.  (*Id.*)  At Step Three, the ALJ found that Martinez did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (*Id.* at 102.)  Next, the ALJ determined that Martinez retained the RFC to:

> [P]erform light work as defined in 20 CFR 416.967(b) except that [Martinez] can push[,] pull, climb, balance, stoop, kneel, bend, crouch, and crawl on an occasional basis.  She cannot work at jobs containing concentrated exposure to airborne irritants such as fumes, odors, dusts, gases, and smoke.  She can work at low stress jobs, defined as jobs containing no more than simple, work related decisions with few, if any, workplace changes.

(*Id.* at 104.)  At Step Four, the ALJ found that Martinez was unable to perform her past relevant work.  (*Id.* at 108.)  Finally, at Step Five, the ALJ relied on the testimony of the vocational expert to find that there are jobs that exist in the national economy that Martinez can perform given her age, education level, and RFC.  (*Id.* at 109.)  Accordingly, the ALJ found Martinez not disabled.  (*Id.* at 110.)

In support of her cross-motion for judgment on the pleadings, Martinez argues that the ALJ erred in making her RFC determination and identifying jobs that she could hold in the national economy.  Specifically, Martinez contends that: the ALJ violated the "treating physician rule" and failed to develop the record; and the ALJ's conclusion that Martinez could perform certain jobs identified by the vocational expert is not supported by substantial evidence.

## II.    The Treating Physician Rule and the ALJ's Duty to Develop the Record

Martinez argues that the ALJ violated the treating physician rule and failed to develop the record.  (Pl.'s Mem. Cross–Mot. (Doc. No. 15) at 9–13.)  First, Martinez asserts that the ALJ improperly discounted the notes of Dr. Daniel, one of Martinez's treating physicians.  (*Id.* at 11.)  Second, Martinez argues that the ALJ should have obtained additional treatment notes from Dr. Daniel.  (*Id.* at 10.)  Third, Martinez maintains that the ALJ should have sought functional assessments from Drs. Daniel and Kurahashi.  (*Id.* at 10–11.)  Finally, Martinez claims that the ALJ failed to give due consideration to the reports of all the psychiatrists who treated her at CCM.  (*Id.* at 12.)  For the reasons set forth below, these arguments are unavailing.

"[T]he ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  This duty "arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination," and although this duty is heightened when a claimant proceeds *pro se*, it "exists even when, as here, the claimant is represented by counsel." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996).  While it is true that the affirmative duty to expand the record does not extend *ad infinitum*, reasonable efforts must be made to seek out further information where evidentiary gaps exist, or where the evidence is inconsistent or contradictory. *Cadet v. Colvin*, 121 F. Supp. 3d 317, 320 (W.D.N.Y. 2015).

The "treating physician rule," which requires deference to the opinion of a claimant's treating doctor, "goes hand in hand with the ALJ's duty to develop the record." *Price o/b/o A.N. v. Astrue*, 42 F. Supp. 3d 423, 432 (E.D.N.Y. 2014).  A claimant's "treating physician" is defined as her "treating source" – i.e., a "physician, psychologist or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and

who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R.

§ 404.1502. The opinion of a treating physician "is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citation and quotation marks omitted).

Citing the treating physician rule, Martinez argues that the ALJ in this case failed to give sufficient deference to the opinion of Dr. Daniel, her primary care doctor. (Pl.'s Mem. Cross–Mot. at 11.) Martinez's sole basis for that argument is the following text from the ALJ's opinion: "Little weight is given to the opinions of Dr. Flores (Exhibit 2F) and Dr. Rose (Exhibit 7F), both doctors from Arbor WeCare. These doctors have never treated the claimant before and therefore did not possess the longitudinal understanding of the claimant's history or symptoms." (Admin. R. at 108; *see* Pl.'s Mem. Cross–Mot. at 11.) In that passage, the ALJ states that he is discounting the opinions of "Dr. Rose," as set forth in "Exhibit 7F." (Admin. R. at 108.) However, no part of the administrative record – let alone Exhibit 7F – contains any notes from a "Dr. Rose." (*See generally id.*) Moreover, Exhibit 7F does not contain any notes from Dr. Daniel, whose first name is Rose. (*See generally, id.* at 413–62.) Therefore, the ALJ must have been discounting either: the opinions of Dr. Daniel, whose notes *do not* appear in Exhibit 7F; or the opinions of another doctor, whose notes *do* appear in that exhibit. The ALJ's description of the contents of Exhibit 7F indicates that it was the latter.

Specifically, two pages prior to the passage on which Martinez relies, the ALJ summarizes the relevant notes from Exhibit 7F. (*See id.* at 106.) In those notes, the ALJ writes, a psychiatrist from WeCARE indicated that Martinez:

> [H]as a history of a bipolar disorder . . . . gets anxiety episodes, which improved
> with medications . . . . has an incompletely treated chronic mood disorder, a

> probable mood disorder, a panic disorder with agoraphobia, claustrophobia,
> chronic PTSD with flashbacks, childhood and domestic violence/abuse
> survival . . . [does not have a] personality disorder . . . . is too symptomatic with
> chronic symptoms, along with her other medical problems . . . . [and] had
> functional limitations that would last twelve months.

The ALJ lifts that summary almost verbatim from Exhibit 7F. (*See id.* at 421, 427.) The fact that the ALJ (i) says that he is discounting the opinions set forth in Exhibit 7F and (ii) accurately summarizes the notes therein demonstrates that he did not discount the opinions of Dr. Daniel. The ALJ's identification of "Dr. Rose" thus appears to be nothing more than a typographical error and does not, as Martinez argues, warrant remand.[19]

Moreover, the ALJ's decision to discount the opinions that he paraphrases from Exhibit 7F does not constitute legal error. As noted above, the opinions in that exhibit belong to a psychiatrist at WeCARE. They appear in reports dated February 7–8, 2012. (*See id.* at 421, 427.) The only WeCARE psychiatrist who saw Martinez during that time was Dr. Kranjac, (*see id.* at 413–62), and there is no indication in the administrative record that Dr. Kranjac examined or treated Martinez on any other occasion. (*See generally id.*) One must have "an ongoing relationship with [the claimant]" to be considered a treating physician. 20 C.F.R. § 404.1502. Therefore, Dr. Kranjac does not qualify as a treating physician. Accordingly, the treating physician rule does not require the ALJ to provide any deference to Dr. Kranjac's opinion. Notably, Martinez does not argue otherwise.

---

[19] Remand is not proper where an ALJ has made a typographical error that did not ultimately affect the benefits analysis or determination. *See, e.g., Johnson v. Colvin*, No. 13-CV-3745 (KAM), 2015 WL 6738900, at *15 (E.D.N.Y. Nov. 4, 2015), *aff'd sub nom. Johnson v. Comm'r of Soc. Sec.*, No. 15-CV-4041, 2016 WL 6106936 (2d Cir. Oct. 18, 2016) (affirming a denial of benefits where "the ALJ mistakenly referred to Dr. Hahn as Dr. Slowe" and "the ALJ did in fact repeatedly make this mistake," but the "probable typo had no substantive impact on the ALJ's analysis"); *Burden v. Astrue*, No. 07-CV-0642 (JCH), 2008 WL 5083138, at *10 (D. Conn. Aug. 26, 2008), report and recommendation adopted, 588 F. Supp. 2d 269 (D. Conn. 2008) (finding it "irrelevant" that "the ALJ misidentified a statement by Dr. Perlin as 'Dr. Perlman's conclusory statement'" where the misidentification did not bear on the ALJ's determination).

Next, Martinez claims that because Dr. Daniel was a treating physician, the ALJ had an obligation to obtain all of the records compiled by Dr. Daniel.[20]  (Pl.'s Mem. Cross–Mot. at 11.) However, the law in this Circuit contains no such requirement.  *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (an ALJ must contact a treating physician for more information than is in the administrative record "[i]f an ALJ perceived inconsistencies in a treating physician's reports").  In this case, the ALJ did not identify – and Martinez does not describe – any inconsistencies in Dr. Daniel's reports.  (*See generally* Admin. R. at 99–110.)

Moreover, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Rosa*, 168 F.3d at 79 n.5.  Such gaps existed in *Rosa* because the administrative record did not contain any notes whatsoever from: a hospital visit that occurred on the day that the claimant became disabled; an entire course of physical therapy treatment that took place over "a significant period of time"; and treatment by an orthopedic surgeon and a neurologist.  *Id.* at 80.  In contrast, the record in this case contained: the clinical examination findings and opinions of two consultative examiners, Drs. Thukral and Lancer; the opinion of a psychological consultant, Dr. Kessel; reports from WeCARE; and treatment records from Interfaith, CCM, PHP, Kingsbrook, Wykoff, and

---

[20] The administrative record might not contain all of Dr. Daniel's treatment notes.  Upon appealing the ALJ's decision, Martinez reported that Dr. Daniel was her primary care physician, that she visited Dr. Daniel in July of 2012, and that she was scheduled for another appointment with Dr. Daniel in August of the same year.  (Admin. R. at 273.)  Notes from those appointments – if they exist – are not in the administrative record.  (*See generally id.*) However, the administrative record does contain Dr. Daniel's treatment notes from two separate occasions – one from February 24, 2011, when Martinez saw physician's assistant David Blaze, a colleague of Dr. Daniel, and another from October 5, 2011, when Martinez saw Dr. Daniel.  (*Id.* at 400–04.)  Moreover, Dr. Daniel was not Martinez's only provider of primary care services.  Rather, on September 14, 2012, Dr. Mohammad of Interfaith performed a comprehensive general physical examination.  (*Id.* at 544–46.)  And Dr. Haque of Interfaith performed another complete annual physical examination on September 12, 2013.  (*Id.* at 941–13.)  Both examinations were reflected in the administrative record and were generally unremarkable.  (*See id.* at 544–46, 941–43.)  Accordingly, the administrative record contained multiple documents – in addition to those from Dr. Daniel – chronicling Martinez's receipt of primary care services during the relevant period.

Woodhull.  (*See generally* Admin. R.)  Altogether, the ALJ had almost 680 pages of medical records before him.  (*Id.*)  Thus, there were no gaps in the administrative record.[21]

For the same reason, the ALJ was not obligated to seek functional assessments from Drs. Daniel and Kurahashi.  As the Commissioner notes, the Social Security Commission's regulations were modified approximately two years before the ALJ issued his decision in this case.  *See* How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651-01 (Feb. 23, 2012).  The modification provides more discretion to ALJs in deciding whether to re-contact treating physicians for additional information.  *Id.*  Likewise, 20 C.F.R. § 416.920b provides that an ALJ may – but is not obligated to – re-contact a treating physician when the existing record evidence is inconsistent or insufficient to make a disability determination.  Accordingly, the lack of a functional assessment from a treating physician does not mandate remand – especially where, as here, the claimant's complete medical record is available to the ALJ.  *See Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (summary order) (rejecting the argument that remand was necessary to obtain a treating source opinion, where the ALJ based his findings on the report of a consultative psychologist, and also had the claimant's complete medical history and treatment notes); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order) ("[W]e hold that it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity"); *see also Pellam v. Astrue*, 508 F. App'x 87, 90 n.2 (2d Cir. 2013) (summary order) (citing 20 C.F.R. § 416.913(b)(6) and finding that the ALJ had no further obligation to

---

[21] Martinez makes the throwaway argument that the administrative record is deficient because it allegedly is missing four pages of notes from Dr. Shalenberg.  (*See* Pl.'s Mem. Cross–Mot. At 12–13.)  However, Martinez does not support that argument by citing to the administrative record or describing in any way what content is missing.  (*See id.*)  Moreover, at the hearing before the ALJ, Martinez's attorney confirmed that the record was complete, except for one missing document from a doctor other than Dr. Shalenberg.  (*See* Admin. R. at 25.)

supplement the record by acquiring a medical source statement from one of Plaintiff's treating physicians, particularly considering that the ALJ had all of the doctor's treatment notes). Given the extensive nature of the medical records in this case, described above, the ALJ was not obligated to seek functional assessments from Drs. Daniel and Kurahashi.

Finally, Martinez's argument that the ALJ "completely ignore[d]" the treatment notes from the psychiatrists at CCM is unavailing. As the Second Circuit has noted, "where 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *see also Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 448 (2d Cir. 2012) ("An ALJ does not have to state on the record every reason justifying a decision," and "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.") (internal quotation marks and citations omitted)). In this case, Martinez neither contends that the ALJ's rationale is not evident nor explains how the notes of the CCM psychiatrists contradict the ALJ's conclusions.[22] Therefore, the fact that the ALJ did not expressly address the CCM psychiatrists' notes does not constitute error.

## III. Substantial Evidence

Martinez argues that the ALJ's decision is not based on substantial evidence for two reasons. First, she characterizes Dr. Thukral's opinion of her physical limitations as "remarkably vague" and argues that the ALJ erred in relying on it. (*See* Pl.'s Mem. Cross–Mot. at 13–14.)

---

[22] The Court notes that none of those psychiatrists opined that Martinez could not work. (*See generally* Admin. R. at 488–505, 952–967.)

Second, she contends that the vocational expert's testimony conflicted with the DOT, and that the ALJ erred in failing to address that conflict. (*Id.* at 14–17.)

### a. The ALJ's RFC Determination and Dr. Thukral's Opinion

The ALJ concluded that Martinez possessed the RFC necessary to complete certain jobs that fit the definition of "light work" set forth in 20 C.F.R. § 416.967(b). (Admin. R. at 109–10.) Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and it "requires a good deal of walking or standing . . . or . . . sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b). Importantly, the ALJ concluded that Martinez could hold only some – not all – jobs fitting that description. (Admin. R. at 109–10.) As examples of the kinds of jobs involving "light work" that Martinez could hold, the ALJ listed "cashier," "mail clerk in a business," and "information clerk." (*Id.*)

The ALJ's conclusion that Martinez could hold those jobs and others like them was based on the following RFC determination:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b)[,] except that the claimant can push[,] pull, climb, balance, stoop, kneel, bend, crouch, and crawl on an occasional basis. She cannot work at jobs containing concentrated exposure to airborne irritants such as fumes, odors, dusts, gases, and smoke. She can work at low stress jobs, defined as jobs containing no more than simple, work related decisions with few, if any, workplace changes.

(*Id.* at 104.) The ALJ based that determination in part on Dr. Thukral's opinion. (*See id.* at 108.) One portion of that opinion describes "moderate limitations for standing (for a long time), bending, pulling, pushing, lifting, carrying, or any other such related activities due to lower backache." (*Id.* at 487.)

Martinez contends that Dr. Thukral's use of the term "moderate" is "remarkably vague," and that the ALJ's determination therefore is not supported by substantial evidence. (*See* Pl.'s Mem. Cross–Mot. at 13.) The Second Circuit has expressly held that an RFC for light work can be supported by medical opinions that use descriptive terminology, including terms like "mild" and "moderate."[23] *See Lewis v. Colvin*, 548 F. App'x 675, 677 (2d Cir. 2013) (summary order) ("[T]he ALJ's determination that [claimant] could perform 'light work' is supported by [the doctor's] assessment of 'mild limitations for prolonged sitting, standing, and walking.'"); *see also Nelson v. Colvin*, 12-cv-1810 (JS), 2014 WL 1342964, at *12 (E.D.N.Y. Mar. 31, 2014) ("[T]he ALJ's determination that [claimant] could perform 'light work' is supported by [the doctor's] assessment of 'mild to moderate limitation for sitting, standing, walking, bending, and lifting weight . . . .") Thus, in this case, the ALJ properly relied on Dr. Thukral's description of Martinez's "moderate" limitations.

### b. The ALJ's RFC Determination and the Vocational Expert's Testimony

Martinez's final argument is that the ALJ failed to identify and resolve conflicts between the testimony of the vocational expert and the DOT. (*See* Pl.'s Mem. Cross–Mot. at 14–17.)

---

[23] Martinez relies on two Second Circuit cases that are inapposite. In the first of those cases, the Circuit held that a doctor's statement that the claimant "should be able to lift . . . objects of a mild degree of weight on an intermittent basis" was too vague to constitute substantial evidence due to the words "mild" and "intermittent." *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013). The Circuit came to that conclusion in part because the claimant "testified that he could not carry even a gallon of milk." *Id.* Martinez, however, offers no evidence to contradict Dr. Thukral's description of "moderate" limitations. In the second case that Martinez relies on, the Circuit remanded due to the ALJ's reliance on a report that employed the terms "'moderate' and 'mild,' *without additional information*." *Curry v. Apfel*, 209 F.3d 117 (2d Cir. 2000) (emphasis added). In this case, Dr. Thukral's report goes far beyond the doctor's description of "moderate" limitations; it provides, *inter alia*, the following additional information: Martinez had a normal gait, both with and without the use of her cane; her ranges of motion were full in the cervical spine, hips, knees, and ankles; and her ranges of motion in the lumbar spine were reduced, but straight leg raising was negative bilaterally. (Admin. R. at 485–86.) That information sheds considerable light on the meaning of "moderate limitations for standing (for a long time), bending, pulling, pushing, lifting, carrying," and related activities. Moreover, the Court notes that Dr. Thukral's report was by no means the sole basis for the ALJ's opinion. Rather, the ALJ wrote – and Martinez does not dispute – that the RFC determination was based on Dr. Thukral's opinion as well as the opinions of two other consultative examiners and "the totality of the rest of the evidence." (*Id.* at 108.)

The DOT sets forth a General Education Development Scale ("GED Scale"), which describes the level of education, both formal and informal, required for satisfactory performance in different jobs. *See* Components of the Definition Trailer, DOT Appendix C, *available at* http://www.occupationalinfo.org/appendxc_1.html#III (last visited Mar. 22, 2017). The GED Scale breaks down the level of education into three categories: reasoning development, mathematical development, and language development. *See id.* The reasoning development category is at issue in this case. (*See* Pl.'s Mem. Cross–Mot. at 14–17.) It contains six levels of development. DOT Appendix C. Three of those levels are relevant here. (*See* Pl.'s Mem. Cross–Mot. at 14–17.) They are:

> 04 LEVEL REASONING DEVELOPMENT[:] Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form. (Examples of rational systems include: bookkeeping, internal combustion engines, electric wiring systems, house building, farm management, and navigation.) . . .
>
> 03 LEVEL REASONING DEVELOPMENT[:] Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations. . . .
>
> 02 LEVEL REASONING DEVELOPMENT[:] Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

*See* DOT Appendix C.

The vocational expert testified that the following are examples of jobs Martinez could perform in the national economy, as defined in the DOT: cashier II, mail clerk in a business, and information clerk. (Admin. R. at 67–68.) The cashier and mail clerk positions require a reasoning level of three, and the information clerk position requires a reasoning level of four. *See* DOT Job Classifications at 1991 WL 671840 (DOT 211.462-010); 1991 WL 671813 (DOT

209.687-026); 1991 WL 672187 (DOT 237.367-018). According to Martinez, the ALJ's description of Martinez's RFC indicates that she cannot perform jobs with a reasoning level greater than two. (*See* Pl.'s Mem. Cross–Mot. at 16.) Thus, Martinez contends, the vocational expert testified that she can hold jobs which require a higher level of reasoning than her RFC allows.

Martinez focuses on the portion of the ALJ's RFC determination that states she can hold "jobs containing no more than simple, work related decisions with few, if any, workplace changes." (*See id.*) That language, according to Martinez, forecloses her from holding jobs that require more than level-two reasoning. (*See id.*) However, a reasoning level of three is not inconsistent with "simple" work. *See Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 408–09 (D. Conn. 2012), *aff'd* 523 F. App'x 32 (2d Cir. 2013) (summary order) ("GED level 3 reasoning is not inconsistent with the ability to perform only simple tasks."). Therefore, there is no inconsistency between the ALJ's RFC determination and the vocational expert's testimony that Martinez could function as a cashier or mail clerk. This ends the Court's inquiry, as "the Commissioner need only show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). The ALJ identified approximately 191,426 cashier and mail clerk jobs that Martinez could perform in the national economy. (Admin. R. at 109.) Therefore, the ALJ's determination that Martinez could hold the jobs of cashier and mail clerk was sufficient to deny benefits. Accordingly, the Court need not and does not reach Martinez's last argument: that the ALJ's conclusion that Martinez could function as an information clerk was not based on substantial evidence.

**CONCLUSION**

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is granted, and Martinez's cross-motion for judgment on the pleadings is denied. The Clerk of Court is respectfully directed to enter judgment accordingly and close this case.

SO ORDERED.

Dated: Brooklyn, New York
      March 27, 2017

s/Roslynn R. Mauskopf
_____
ROSLYNN R. MAUSKOPF
United States District Judge